and Case No. 15-1877 and 15-1941, the National Labor Relations Board v. the 1199-SEIU United Health Care Workers. Thank you. Good morning, Your Honors. My name is Betsy Ehrenberg. I represent 1199-SEIU, Service Employees International Union. And in this case, the union seeks review and reversal of a decision of the National Labor Relations Board finding that the union sought and did cause Steward Good Samaritan Medical Center to discharge the charging party, Mr. Legley, and by the diminutive steward, Darlene Levine, threatened him with unspecified reprisals when she told him, I know the people in your department and they're not going to put up with you. All of this in a context where the administrative law judge found, undisturbed by the board, that the union never, quote, asked for, suggested, recommended, or demanded that the employer discharge Legley, end quote. And where the administrative law judge makes clear in his decision that from the outset of the hearing, and he erroneously framed this case and his hearing of the evidence under an improper standard, the Atlantic Steel Standard for determining whether conduct remains protected in light of an employee-employer interaction. That is not the proper standard for employee-employee interaction. But the ALJ heard the entire case under the Atlantic Steel Framework. And when he didn't hear that in the orientation Mr. Legley jumped up and was profane and vulgar and threatened violence, his decision reads as if he became uninterested in the rest of the evidence. Because to a shocking degree, at every step of his analysis, if you can even call it that, he ignores or dismisses or doesn't even mention a whole volume of evidence to a truly egregious extent. After he failed to apply the correct analysis, the right-line analysis, the board tried to salvage the decision, but the board applied an incorrect version of right-line. Right-line requires the board to determine whether a union or an employer who takes an action had a good faith belief in the misconduct or the conduct that is at issue. It does not require the union or the employer to prove that the misconduct happened. Now, in this case, the standard of review is canonical. Substantial evidence is very specifically defined. It must take into account the record as a whole, including whatever fairly detracts from the board's decision. It may not distort the fair import by ignoring whole segments of uncontroverted or credible evidence. It must make a fair assessment of the worth of witness testimony, and it must avoid systematic undervaluation of certain evidence. As to facts and law, the court must determine whether the agency considered pertinent evidence and sufficiently articulated an explanation for its actions. This case is thick with facts. The union is not here asking the court to second-guess findings of the board and the ALJ, but we are asking the court to read the record carefully because what you will find there, this decision falls egregiously short of the substantial evidence standard at basically every point in time. For example, to find the conduct of Mr. Legley at orientation protected, he ignores the testimony of Darlene Levine, the steward who conducted the orientation, and her rendering of the behavior that she observed. He ignored Kimberly Derby's, the so-called neutral witness, corroboration of much of what Ms. Levine said. He ignored the testimony of Mr. Nicolades, who was the union steward, a co-employee of Mr. Legley. In the board's decision, it starts off by saying the judge found in her party disputes that charging party Camille Legley engaged in activity protected under Section 6-7 of the NLRA. So are you just disputing whether he engaged in protected activity? We are disputing that his activity as a whole in the orientation was protected, which was the presumption. How does that square with no one disputes that he engaged in protected activity? I thought the only issue was even though he engaged in protected activity, he might be disputing whether he caused his termination and whether the reason for if there was a cause of termination was because of the protected activity. Is that not right? The union agrees that statements concerning union membership in isolation will be protected activity. However, a whole body of evidence of testimony was unaddressed. Credibility determinations were made without explanation, which ignored that those isolated comments came in a context of complaints and interruptions multiple times. But those might be reasons why you could terminate the employee, notwithstanding the employee's assertions that were protected. That's different than saying it was not protected activity. Well, but I... But it matters because, and I just want to make sure I'm simple, we're supposed to review here because the board's representing, and I'm saying it would be challenging that there was not a dispute as to whether there was protected activity here. I thought the dispute was simply whether you had a good enough independent reason for firing the employee because of the non-protected statements the employee made. Well, we're kind of saying both because under the Atlantic States... Did you argue to the board he did not engage in protected activity? We argued to the board... So the board's just flat out wrong when it says no party disputes that he engaged in protected activity? In my view, the board is wrong because the board... You did dispute that. The board oversimplified and misread what the union had to say about the statements concerning union membership. We argued that the ALJ was wrong to apply an Atlantic Steel standard to say his conduct retained protection because he didn't become, frankly, violent or vulgar and so on. Board cases hold that far less egregious misconduct, as between employees can deprive the conduct of a protected character. For example, there's a case that we cite where a woman is removed from a hiring hall because she shouts and so on. She doesn't meet the Atlantic Steel standard, but the board found that the union was justified in removing her from the hiring hall because she scared the employee. No, that's not inconsistent with the finding that there's protected activity. That's just a conclusion that even though there's protected activity, you still had a good reason to fire the person. So I thought that's all that's really at issue here. Well, I mean, maybe we're talking about the same thing. We're talking about whether his conduct as a whole retained the quality of protected activity that immunizes him from adverse action. Now, what's also true in this case is that our position is the union never took any adverse action to him, and it required ignoring an entire body of evidence to find that anything the union did here or the union's stewards constituted adverse action against Mr. Legley because of his protected statements. What was at issue here and what the overwhelming balance of the evidence ignored by the ALJ and the board shows is that Darlene Levine was a 30-year employee and a long-time steward, very steely, whom no one had ever seen become as emotional and start crying as what happened here. And that was their concern. She reported to Mr. Nicolades, he interrupted me repeatedly. He pointed his finger at me. He complained about coming up five flights of stairs. He complained about not being met in the lobby. I couldn't get my presentation out. I couldn't get a word in edgewise. And what's really interesting and also ignored by the ALJ and the board is that Ms. Levine's description of Mr. Legley's conduct in this small room is almost an echo of a description by a hospital witness, Jen Dorsey, who was a human resources assistant, who encountered Mr. Legley in the course of his onboarding, if you will, when he was in the hospital before he began work to fill out papers and so on. And she described him as interrupting me repeatedly to a point where I couldn't finish what I had to say and I couldn't get a word in edgewise. And there was no accounting for the fact that Ms. Levine's description of Legley's conduct and what upset her so deeply was practically an echo of what another employee had experienced. Isn't there a problem, though, because doesn't the ALJ attempt to pinpoint precisely what each of these people says they observed and experienced, and doesn't he say that they really couldn't come up with any examples? Well, but he cherry picks. I mean, if you read the record as a whole, he picks out very specific moments in time and ignores the balance. For example, he ignores that Derby, the so-called neutral witness, corroborated that Legley had a loud voice and a big presence, corroborated that he asked more questions than anyone else and asked some of those questions repeatedly, corroborated, as did Legley, that Legley could have been perceived to be interrupting Levine. And all of those characteristics of Legley's behavior were corroborated by the so-called fresh complaint witnesses, the two people, Leveille and Nicolades, with whom Levine spoke immediately following the orientation. And what she said to them was, I couldn't get a word in edgewise, I couldn't finish my presentation, he kept interrupting me, he was big and he was loud and I was scared. And they had never seen this before. That's what concerned them. And the board and the ALJ ignored all evidence that supports that conclusion about what really happened here. I see my time is up. I would like to reserve, if I have anything left, I would like to reserve a minute. I don't know that you do, but if you do, you will get it. Thank you. Mr. Amash, good morning. Good morning. May it please the Court. Joseph Amash, I represent Good Samaritan Medical Center. I would also like to reserve one minute for rebuttal, if I may. Okay. It's black-letter law that the board has to issue a decision that is consistent with the law, that's coherent, that's rational. With regard to the two items in this case that affected the hospital, one is the decision about Mr. Legley's termination, and the other is their order that we rescind the perfectly lawful civility rule. The board did not apply the law and did not rationally explain their decision. If I could first address the issue of the termination. So if you look at the decision, the board spent about six sentences in its entirety dealing with the employer. So first the board cites the Palmer House case. The Palmer House case deals with a union request to terminate somebody who didn't pay their dues. It has nothing whatsoever to do with this case. Mr. Legley was probationary. He didn't owe dues. And then the board says nothing else other than when a union asks an employer to fire somebody and the employer reasonably believes that that information may be wrong, the employer is liable. That only relates to dues paying, and that relates to one of the provisos to 8A3 of the Act, which has nothing to do with this. So then in an attempt, I think, to rescue their recitation of the Palmer House, in their brief for the first time, the board articulates a theory that doesn't exist anywhere in the law that says, well, the employer under Palmer House has to investigate a request. It only has to investigate a request to fire somebody for not paying dues. The theory of so-called investigating any other request not only does not exist in the law, but it makes no sense because lawfully a union can't request termination of an employee for any reason other than not paying dues. So that's their first alleged theory. I don't think I followed the first argument. If the union requests an employer to fire an employee for being incredibly disruptive in the workplace, that's an inherited unlawful request? No. If the union requests termination, the union brings something to the employer's attention that relates to the employee's conduct. In certain instances, it may be perfectly lawful. So when that happens, suppose at the same time that the union informs the employer of that, the employer is also aware that maybe the reason the union is doing that is because of the employee's protected conduct. If the employer is aware of that, so why wouldn't it make sense? Why wouldn't the board be empowered to say, shouldn't the employer, before it goes ahead and fires somebody that the union has said needs to be fired because of their bad conduct, shouldn't it check and make sure that the real reason they're not being asked to fire is because of protected conduct? Well, the record, Your Honor, in this case is that the hospital did investigate. Well, that's a fact point. But I thought you made a legal point that it's arbitrary for the board to impose a duty of investigation on the employer even when the union is seeking the firing of an employee in circumstances in which the reason they might be doing it is because of the employee's protected conduct. I don't know what you're saying about arbitrary. We think it's arbitrary because it's never, ever before been articulated by the board. But why does that make it arbitrary? The board's allowed to come up with a rule as long as it's a reasonable rule. Well, they didn't come up with a rule in this case, in the decision. Well, they applied it in the brief. They never stated it in the decision at all. I thought that they held that. No. They relied on the precedent that you think they shouldn't have extended. Yes, but they didn't say in the decision, oh, you didn't do an investigation, I said. They didn't say even a word about that. They came up with that in their brief. But then they go on in two sentences to allude to the right-line factors without using the term right-line. But in their brief, they tell this court that they relied on right-line, and that's the proper analysis. The problem in this case is that the right-line analysis requires, number one, that the general counsel prove animus. There was not a single word in the board's decision demonstrating animus on the part of the hospital. In fact, the record evidence showed that they had no animosity toward people who didn't want to join the union. Secondly, they have to show under this court's precedent that there's a causal relationship between the employer's decision to terminate the individual and the protected activity, as opposed to all of the other conduct that Mr. Legley engaged in during the onboarding and at the beginning of the meeting as well. And thirdly, it's crystal clear under the law, and we cite that in the Sutter East Bay case, it's crystal clear that the employer's good-faith belief has to be assessed by an LRB as to did the employer have a good-faith belief as to whether or not the employee's conduct violated its policy. No discussion of that at all in the two sentences in which they appear to allude to right-line. And finally, the board puts in one sentence that says, well, the employer didn't demonstrate that it would have terminated Mr. Legley even in the absence of the protected activity. However, the King's Law is crystal clearly cited in the Avondale Industries case to you. The King's Law is crystal clear that where the employer has a rule, such as a rule against disrespectful and uncivil behavior, and where there's no showing that the employer has ever imposed that rule in a disparate way, and there was no showing in this case, the board law establishes that that satisfies the employer's burden that it would have terminated the employee notwithstanding the alleged protected activity. So with regard to the termination, we feel that we're entitled to a rational explanation and a rational analysis of the law as articulated in the decision that did not happen in this case in the two sentences in which they're talking about right-line. Then, if I may segue to the other part of the case, the board ordered our hospital to eliminate, to rescind, a perfectly lawful rule against civility in the workplace. Civility in the workplace is something that all employers in the United States desire and want to maintain. Can I ask you something about this? If an employer adopts a rule that says no problematic conduct, and then applies it in a way that is violative of the workplace rights in the NLRA, I understood it at that moment when you have a vague general workplace rule, and you've applied it in a problematic way. At that point, the board deems the rule to be unlawful. Is that right? That is the third prong of my theory of heritage. So why is this case any different than that? You have a civility rule that was applied impermissibly. Yes. Hence, that rule now becomes an unlawful rule under the board precedent. Yes. And then the remedy for an unlawful rule is rescind the rule. Maybe you can readopt it by saying we'll make clear that in the future we won't apply it in any problematic manner, et cetera. Because, number one, there is no, under the Lutheran heritage, third prong. This is the first appeals court to consider the third prongs at all, the application of the third prong. And two members of the board in this case, in footnote nine, indicated that they disagreed with their own remedy. They said it doesn't make sense. But you're challenging the third prong? Yes. So are you challenging the legality of that third prong? Absolutely, Your Honor. The third prong makes absolutely no sense. The board's cases. I thought you were challenging the remedy. I didn't understand you were saying that you can't declare it an unlawful rule. The board can decide that a rule is, as applied, is invalid. But the remedy, yes, I am challenging that the remedy of rescind. I just don't know if you can parse it that way. Once you're not challenging the fact that it is an unlawful rule and the board's entitled to treat it as an unlawful rule, then we're just in the realm of trying to figure out what remedies the board can, at its discretion, adopt. If I may answer, first of all, the cases Albertsons and Sheraton Anchorage, which we've cited, the board cited Albertsons, specifically say that the board has to find a context in which the rule is applied in order to apply the third prong. In this case, there was no context of publicizing to employees and telling the world that this rule is being used to deprive people of protected activity. No context at all, no recitation in this decision of that. Secondly, the board members themselves make a distinction between Lutheran's third prong, which says when applied, it could be, it says in a footnote in Lutheran, it may be deemed to be invalid. But the remedy that is suggested by two members of the board is simply tell the employer not to apply it to protected activity. Otherwise, we are our hospital and every single employer that would face the same situation is placed in the impossible position of being told by the board in its brief, oh, simply write another rule. Well, if the rule is perfectly lawful, if the rule says be respectful and civil and the board says, oh, yeah, that's lawful, how am I as the attorney for the hospital or any management attorney in this country to go to our client and say, oh, well, the board said it's not lawful, so let's change a couple of words here. It offends public policy and it really creates a situation in which no employer can rely on its decision to have rules. We agree that if, we don't agree it happened here, but if an employer applies a perfectly lawful rule to a situation of protected activity, which, again, we don't think happened here, the remedy would be don't apply it that way. Don't apply it to Section 7 activity. That's what two members wrote in their footnote and they actually said, oh, well, we're going to go along for institutional reasons. Well, as the D.C. Circuit said in the Adrian's case and we quoted it, you can't, that institutional decision merely because it exists doesn't make it rational. And in this case, we think that a rescission remedy of a perfectly lawful rule is an absurdity, Your Honors. Thank you. Mr. Soter, good morning. Good morning, Your Honors. May it please the Honorable Court, Greg Soter for the National Labor Relations Board. What Mr. Lately did when he stood up at that orientation meeting is what every employee should feel free to do under the National Labor Relations Act. He asked an honest question in response to an incorrect statement by the union representative. And for his trouble, the union reported him to the employer, which fired him the very next day. And that's precisely the kind of- Was he in any way disruptive? The board found that he was not, Your Honor, and that finding is essentially based on his testimony as corroborated by Kim Derby, who was, as Mr. Ehrenberg noted, the only neutral witness to the hearing who also observed the orientation. And Mr. Derby testified that he asked some questions. He asked maybe more questions than the other ladies, but the other ladies asked questions as well. And he wasn't disruptive. Was he disruptive at any other time? I'm sorry? Was he disruptive at any other time? Outside of the orientation? Yes. Again, the evidence shows that he was not.  How does that make it difficult to deal with? Well, good question. And I spent a lot of time poring over the transcript of this case to try to find out what that means. And all I could figure out was that apparently he wanted copies of all his paperwork. And that made the process go more slowly, and that upset several people in the HR department. But that's not, in and of itself, an unreasonable request. And, you know, for a 72-year-old man that maybe is not quite used to all the HR paperwork that we have these days, for him to ask for copies of his paperwork is hardly a basis to find him as rude or aggressive or disruptive. Well, supposing that was the reason why he was discharged? That's what the hospital would say. Why is that protected? Well, his request… Supposing that the employer found him disruptive, even if he wasn't, they found that he was? If they had found that he was disruptive in that setting aside the orientation, okay, if they had found that he was disruptive, they could have fired him right then and there. They knew that this was an older man who could be a little difficult, but they didn't. They kept him on because he was hired to work the hardest shift in the entire week, Friday nights and Saturday nights. And they couldn't get anyone for that shift. And what that shows is that they were perfectly willing to deal with the person who was a little difficult. Well, if the person was going to be permanently disruptive, would that be appropriate? If he had actually been disruptive and rude, the employer could have fired him. The problem is the evidence doesn't support that. What if they believed that he was, even though they were mistaken? Would that be a violation of anything? If they had a good faith belief that he engaged in misconduct and that that misconduct arose as part of Section 7 protected activity, if he did not actually engage in that misconduct, if the evidence reflects that there was no misconduct, then the good faith belief is not an excuse for the employer. And that's the burn-up-and-sins analysis, which is actually cited in the ALJ's decision at page 9, footnote 2. So if there is misconduct that does not arise in the midst of protected activity and the employer has a good faith belief that there was misconduct, but in fact it didn't happen, then the employer is perfectly in its right to fire that person. But if the alleged misconduct occurs in the context of protected activity and there was actually no misconduct, then good faith is not an excuse. And that's what the employer says here, is that Mr. Laidman was disruptive at the orientation, that he somehow yelled at Ms. Levine, that he pointed his finger at her, complained, interrupted, didn't give her the time of day, that there was no evidence to support that in the record. And that's why the employer can't rely on this good faith belief, because it happened at the same time as this protected activity that Laidman engaged in. And the reason that we have this system, Your Honor, is simply because it's important for employees to be able to articulate their questions and take union-related positions. And these positions are often politically sensitive, and it's not uncommon for voices to get raised as the judge found that it happened here. But the board says that if it stays within a certain limit, at which there's no evidence that was crossed here, then the conduct remains protected. Now here, not only do we have no evidence of misconduct, but we also have evidence that was credited from Ms. Derby's credited testimony, that Levine told Laidley, asked him where he worked, right after he basically made his statement, showed her, listen, it says in your literature here that I don't have to be a union member. She said, you have to be a union member. Where do you work? And he told her where he worked. And then she said, well, I know people down there, and I'm going to warn them that you're coming, and they're not going to put up with you. And the board found that that is objectively construed as a threat. Saying to somebody that his future colleagues in the boiler room are not going to put up with him is perfectly reasonably construed as a threat. But wasn't that related to the context in which it was made, which was that she felt he was being disruptive? But, Your Honor, the problem is he wasn't being disruptive. The evidence reflects that he wasn't. And so there's only one reason, based on the evidence and Derby's testimony, that she could have said that. It's because they, at some point, Levine and Lavely, raised their voices at each other about this issue of whether he had to be a union member. He challenged her and pointed out that she was wrong, thereby, you know, questioning her authority in front of these other people, and she got upset. And that's how she reacted. And she reacted by threatening him. And that threat is the basis of the board's finding of animus on the union's part, that together with the timing of the report then that was made to the employer, there was this whole chain of discussions between Levine, Lavely at the union, Nicolaides, and then Nicolaides with the employer. And at every step of the way, Lavely's protected conduct was mentioned. At every step of the way, there was talk about the fact that this guy had argued, had had the nerve to argue, to say that he didn't have to be a member of the union to work there. With respect to the hospital, how are we supposed to decide, on a record like this, whether the hospital has an animus? Does the hospital have to have an animus as well? Under the right-line analysis, yes and no. So under the right-line analysis, how are we supposed to decide that the hospital had an animus? Well, the timing might just mean... I understand we've got that comment from the union. And so I can understand how there might be a basis for saying that the union has an animus. But with the hospital, all we know is that the hospital did act when the union asked right away. But why does that show that the hospital had anything other than just, we want to be on the good side of the union? Why does it show it had an animus towards its protected activity? Well, it has to be animus towards, not towards specifically the fact, you know, what he said. But it has to be anti- or pro-union. It can be anti- or pro-union animus. It's animus writ large. And in this case, as you said... I see. So even if it seems that they're doing the union's bidding, that's what we mean by animus in this context? Especially here. I mean, if the employer and the unions are typically at loggerheads, you could say, well, and, you know, why would you care about doing the union's bidding? But in this case, we have testimony that they have, quote, a strategic alliance between the hospital and the union, that they consider themselves close partners. We even have Ms. LeVay, who works for the union, saying at some point, we don't tolerate uncivil conduct at the hospital. We don't tolerate it. Why would that be an alliance? I mean, isn't that normal? I deal with a fair amount of union and employer cases. Alliance is a rare... Strategic alliance between unions and employers is a rare sentence. You made the statement that it was because they had a rule about civility. Isn't that a normal rule? Even if you didn't have a rule like you have here, isn't that what's normally expected? Sure, of course. And the board, including in Lutheran Heritage, stated very clearly that it has no problem with civility rules, and actually that's very important for employers and employees alike. On its face, what is wrong with the rule in this case? Your Honor, the board didn't make... And that's something I wanted to correct about what Mr. Ambash said. The board didn't make a finding as to whether the rule is lawful or unlawful on its face. It also didn't make a... That would be the first, you know... First, under Lutheran Heritage, you look at whether the rule is lawful or unlawful on its face. Then you consider if it was... If employees could reasonably construe it to protect Section 7 activity. The board didn't analyze that either. The board solely focused on the third prong, and the fact that, in this case, the rule was applied to restrict Section 7... But the way Lutheran Heritage works, if I'm understanding it right, is even though it's essentially an as-applied problem, they then deem the rule to be facially unlawful. No, they deem the rule to be unlawful, not facially unlawful. Well, does that mean the whole rule is unlawful, or does that mean the application was unlawful? It means that the rule is unlawful. Does that mean the whole rule is unlawful, or the application is unlawful? No, the whole rule is unlawful. Okay, so that's facial. The whole rule now, even though it was perfectly fine, one application makes the whole thing unlawful. I'm sorry, I misunderstood what you meant by facial. What I meant is that the language... They're not making a judgment as to whether the language itself is unlawful. What they're saying is that no application would ever be permissible under that rule again. Exactly. Because that's the same thing. Well, the Board has been administering the Act since the 1930s, and the Board has found, in all the experience it's acquired in administering the Act, that once a rule is applied to restrict Section 7 conduct, reasonable employees can construe that rule, will understand that rule, as prohibiting that kind of Section activity. And so, essentially, the rule becomes tainted in the employees' eyes, and therefore there has to be this affirmative step of the employer rescinding the rule and then replacing it with the right next day with a similar rule. The identical rule is fine? Not the identical rule, because that would be, obviously, the same wording. Exactly, the employees would just... So what is the guidance as to... I mean, what is management supposed to do? They say, we have a rule that, on its face, is perfectly fine, but it was applied in one instance wrong. Now the Board says that means in all applications it would be illegal. Okay. How do we get... But everybody agrees it's a really great thing to have this rule. So what is the management supposed to do to get back to this state that the Board professes is a good state of this rule existing, even though it's not allowed to adopt this rule? It's not obvious what you're supposed to do. Again, just a slight correction. The Board did not find the rule was, on its face, lawful. And that's just an important correction because... I understand that the impractical effect of it is because there's no application of the rule that it will deem lawful. And so all that the employer has to do is draft a different rule that says the same thing in different language, in different words, and institute it. And the Board's... the employer can seek... can... Actually, the Board has... the General Counsel has addressed this issue because there have been questions by employers like this. And it released a memo, a General Counsel memo, which is 1504 and which is dated March 8, 2015, which is available on the Board's website. It's a public document which discusses various types of rules that have been found unlawful, explains why they were found unlawful, and also discusses rules that were found lawful and explains why they were found lawful. Until they're applied in the wrong case. Ultimately, any rule, if it's applied in the wrong case, will fall under Prong 3. And I think that that's what Judge Barron is asking. What's the employer supposed to do? It seems to me he's throwing the baby out with the bathwater. Well, the employer's trying to represent that it's, you know, the end of the world here to redraft a rule differently. But that's not what he's saying. He's saying he has no idea how he could redraft it. Here's the rule. Be civil in the workplace. Okay, that's now illegal. You tell me, what could we now adopt to make sure that people are civil in the workplace? Be civil in my workplace? That would be fine? I'll preface this by saying that I can't say that whatever I'm about to say is something that the Board would find lawful, okay, because I don't make those decisions. But the employer could say, we believe that civility is important in this workplace and therefore we expect everybody to treat each other in the most respectful way as, you know, in their everyday duties. It says the same thing. It may be a little more long-winded. What's the sense in this approach? Why is this a rational thing to require employers to go through this exercise? And then there's other kinds of revenues you could have. You could have a post notices to people saying, we were found in violation for an application. We understand that that was illegal. We won't do it again. What is the sense of them having to just rewrite, in paraphrased form, the same rule? I don't even think it seems to help the employee because you're not even notifying the employee of the underlying legality. It doesn't even seem efficacious from the Board's perspective. The employees have to be notified that the rule has been changed. The employees have to be notified that the rule has been changed. But they wouldn't have to be notified as to why? You mean as to what incident led to the rule being changed? Yeah. No, not necessarily. But the Board has found from experience that employees talk. But the more direct route would be, as you do in other circumstances, like with repudiation, you would just make them post a notice. Here is the violation of this rule. We won't do it again. Well, there is a notice posting here, Your Honor. But the Board found that actually that's not enough. Why isn't that enough? Because when the rule has been applied in an unlawful manner, employees who talk and who know that so-and-so got fired for violating the civility policy because he questioned whether he had to be a member of the union, in that case the employees will reasonably understand that rule to mean, okay, don't question whether you have to join the union or not. But they'll be disabused of that if the same rule is readopted using slightly different words. Exactly. You know, there are other areas of the law where the law is found to be invalid as applied. They don't throw the whole law out. We just say, as applied under these facts, the law is not valid. Why does that not make any sense here? Your Honor, I would say that it's a much quicker and easier exercise to redraft a rule than to pass an entire new law, especially the way our Congress is now working. But I think that the basis for the Board's decision is that there has to be an act by the employer to show that it will, from here on out, behave differently. And part of that starts with this affirmative action of saying, okay, we're going to set this rule aside and we're going to make a new one and we're going to start fresh. And I understand that this may not be, you know, one could disagree as to whether this is the best solution or the best way to do it, but the Board has a lot of discretion for its remedial measures, and neither the union nor the employer has shown that this kind of remedy is a patent attempt to go against the policies and the objectives of the Act, which is the standard in this case for these remedial issues. Now, I did want to point out something, which is there's very little talk, or among the union and the employer, they repeatedly talk about, you know, all of this assumption that Mr. Legley behaved badly and that he upset Ms. Lavigne and so on and so forth. What's extremely significant, I think, and I would direct this court to pages 507 and 508 of the joint appendix, these are the notes that Ms. Patnoe, the human resources manager, took from the meeting at the luncheon when the decision was made to fire Legley. And in these notes, you will not find a word about Ms. Lavigne being upset or Mr. Legley criticizing her, yelling at her, pointing his finger at her, complaining about the elevator, nothing. There is no mention of that at all. What is mentioned is that he said, it's true, you don't need to join the union. And then he also said, I talked to my attorney friend, and I was told that being part of the union was not a requirement. Those are the two, this is what is mentioned in that one document, which records the decision to fire Legley. There's another mention, he said, you know, he said, I'm not even sure that I want to work here. And if you guys don't want me, I'll just go. And so the hospital, and I believe the union, attempt to latch on to that and say this is negative behavior, this is, he behaved negatively and that's why we fired him. But when Patnoe was asked, what is this negative behavior that Nicolaides was referring to, she says those two statements. She doesn't say the fact that he behaved supposedly boorishly, that he was rude, that he was disrespectful, no, not at all. His negative behavior was the fact that he said, well, I mean, if you guys really don't like me, then I guess I'll go. And that is absolutely not a basis to fire someone, and especially not when you have all this evidence that what they discussed was the fact that he complained that he shouldn't have to join the union if he didn't want to. Unless you have any further questions, the board would request that you enforce its order in full. Thank you very much. Thank you. If I may, I'll be quick. First, Mr. Legley did join the union, and Nicolaides and everybody else knew that from the outset, so it doesn't make any sense that they would be concerned about his statement that he didn't have to. Second, not only the union begs that this record be read very carefully in light of the brevity of the board's decision and the ALJ's decision. Not only did they ignore, without explanation, evidence of the cause of the union's concern, the nature of its limited communications with management, but counsel's statement that there is no evidence in the record of a basis for a good faith belief that he was abusive about unprotected subjects is simply not true. There's no evidence in the decision that he was disruptive, abusive, interrupting about unprotected subjects. There's a quote load of evidence in the record. And finally, these notes are notes that I think are fairly read as Ms. Patnode's notes of what Nicolaides told her that Legley told him. Thank you. Your Honors, the board has mentioned the Burnett and Sims case. I just want to point out that that Burnett and Sims case was not mentioned at all in the board's decision. It was in a footnote where the judge was referring to Mr. Legley's comments about not wanting to join the union. The case is, and there's a line in Southern East Bay in the D.C. Circuit, it says that a mere statement, the board's mere statement that Burnett would apply cannot survive judicial scrutiny. It must be based on substantial evidence and analysis and explanation. Here, the board didn't even mention Burnett. What the board has analyzed this case under or acknowledges as the proper analysis is right line. And under right line, all the questions the panel was asking about, well, what did the employer believe, that is what counts. Did the employer believe that his behavior, not the one word or two words, I don't want to join the union, but the behavior earlier in the meeting, pointing his finger, shouting, et cetera, and the behavior in the three or four interactions during the onboarding. Under right line, the question is, did the employer believe that violated the employer's policy? Not did the NLRB believe under Atlantic Steel that it violated Atlantic Steel. And the board did not spend even one word in its decision analyzing right line properly. Nothing about good faith belief. It didn't find aminus, and it didn't explore the evidence that shows that we have a rule. We enforce it without disparity, and that in and of itself is proof that we would have treated him the same way. So we urge the court to take a look at this decision and realize that if they're telling you that they're deciding this under right line, they have an obligation to do their job and actually analyze it under right line. They didn't. And therefore, we submit that the decision is frankly arbitrary and capricious and doesn't make sense. Thank you. Thank you.